**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**WILLIAM ASKEW,**                        :

      **Plaintiff**                :     **CIVIL ACTION NO. 3:10-2401**

      **v.**                      :          **(KOSIK, D.J.)**
                            **(MANNION, M.J.)**

**RHEA PAONE, RICHARD JENSEN,** :
**TOM HOREIS, PHARMACIST**
**TUTZA, DANIEL HOLLOWAY,**          :
**HEALTH SERVICES ADMIN.**
**SULLIVAN, LT. HICKS, LT. MRAD**   :
**and OFFICER STUFFLE,**

                            :

      **Defendants**

                            :

## REPORT AND RECOMMENDATION[1]

Pending before the court is the defendants' motion to dismiss the plaintiff's complaint or, in the alternative, for summary judgment. (Doc. No. 20). Based upon the court's review of the motion and related materials, it is recommended that the motion be granted.

By way of relevant background, on November 19, 2010, the plaintiff, an inmate at the United States Penitentiary, Coleman, Florida, filed the instant

---

[1]For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

Bivens[2] action, in which he alleges various violations of his constitutional rights by officials and/or employees at the United States Penitentiary at Canaan, ("USP-Canaan"), Waymart, Pennsylvania. (Doc. No. 1). On December 14, 2010, the plaintiff filed the appropriate application to proceed *in forma pauperis*, (Doc. No. 5), and prisoner authorization form, (Doc. No. 6). As a result, a financial administrative order was issued directing the prison warden/superintendent to deduct the proper filing fees for this action from the plaintiff's inmate account. (Doc. No. 7).

By order dated January 19, 2011, it was directed that process issue. (Doc. No. 9). After having been granted an extension of time to respond to the plaintiff's complaint, (Doc. No. 18), on May 4, 2011, the defendants filed the instant motion to dismiss the plaintiff's complaint or, in the alternative, for summary judgment. (Doc. No. 20). A brief in support of the defendants' motion was filed on May 25, 2011, (Doc. No. 29), along with a statement of material facts and exhibits, (Doc. No. 30). After having been granted an extension of time to do so, (Doc. No. 33), the plaintiff filed a lengthy letter with exhibits, which the court construes as the plaintiff's brief in opposition to the

---

[2]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

defendants' motion, (Doc. No. 36).

In his complaint, the plaintiff alleges that, from March 2009 through May 2009, defendants Paone, Jensen, Horeis, Tutza, Holloway and Sullivan denied him topical ointment for a skin condition and, instead, treated him with steroids which he alleges have caused him adverse side effects.

The plaintiff further alleges that the food service staff and various officers at USP-Canaan served him food to which he is allergic and would not provide him substitutes.

Finally, the plaintiff alleges that, on December 1, 2009, defendants Hicks, Mrad and Stuffle tried to break his arm when he was holding the food slot trying to get a substitute for the food to which he was allergic.

The plaintiff is seeking proper medical treatment, as well as monetary damages in the amount of $5 million.

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for

3

discovery and upon motion, against a party who fails
to make a showing sufficient to establish the
existence of an element essential to that party's case,
and on which that party will bear the burden of proof
at trial. In such a situation, there can be 'no genuine
issue as to any material fact,' since a complete failure
of proof concerning an essential element of the
nonmoving party's case necessarily renders all other
facts immaterial. The moving party is 'entitled to
judgment as a matter of law' because the nonmoving
party has failed to make a sufficient showing on an
essential element of her case with respect to which
she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for

its motion and identifying those portions of the record which demonstrate the

absence of a genuine issue of material fact. Id. The moving party can

discharge that burden by "showing . . . that there is an absence of evidence

to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the

evidence presented, could find for the nonmoving party." Childers v. Joseph,

842 F.2d 689, 693-94 (3d Cir. 1988) (citations omitted). Material facts are

those which will effect the outcome of the trial under governing law. Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the

evidence nor make credibility determinations. Boyle v. County of Allegheny,

139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. Id.

In response to the allegations set forth in the plaintiff's complaint, the defendants have submitted a statement of material facts with supporting exhibits. Despite having received the court's standing practice order which sets forth the provisions of Local Rule 56.1 and the manner by which the plaintiff is to oppose such materials, as well as having been advised by the defendants that all facts set forth in their statement of material facts would be deemed admitted pursuant to Local Rule 56.1 if not controverted by the plaintiff, the plaintiff has failed to file a proper response to the defendants' statement of facts. As such, the following facts are deemed admitted pursuant to Local Rule 56.1.

The plaintiff arrived at USP-Canaan on March 26, 2009. Upon his arrival, the plaintiff was diagnosed with high cholesterol; pain in his joint, ankle, and foot; other early skin lesions; flat foot; an unspecified disorder of

skin and subcutaneous tissue; herpes simplex without mention of complication; unspecified asthma; dermatitis/eczema due to unspecified cause; other disorders of the ear; impacted ear wax; other local infections of skin and subcutan tissue; and a history of methicillin resistant staph aureau, ("MRSA"). At the time of his intake assessment, the plaintiff did not report any known allergies. At that time, the plaintiff was prescribed an Albuterol Inhaler HFA; an anti-depressant medication also used to treat itching; a non-steroidal anti-inflammatory; high cholesterol medication; and a steroidal ointment cream used to treat skin disorders, asthma and other medical disorders.

On March 27, 2009, defendant Horeis, Chief Pharmacist, noted that the steroidal medication prescribed to the plaintiff was not sent and ordered on intake when the plaintiff transferred from USP-Lewisburg. Defendant Horeis instructed the plaintiff to return for sick call and the medication would be requested.

On March 31, 2009, defendant Paone evaluated the plaintiff during sick call for complaints of itching on his neck, feet and elbows. During this visit, it was noted that the plaintiff needed a refill of his steroidal medication.

On April 1, 2009, defendant Holloway noted that the plaintiff was a "CCR [Chronic Care Review] New Arrival" with a history of asthma, atopic

6

dermatitis, "mallet finger rt 5th," and plantar fascitis.

On April 3, 2009, the plaintiff reported to sick call for a follow-up appointment concerning his "dry/itchy skin." The plaintiff reported to defendant Jensen that he had suffered with this skin condition for many years. He also reported that he was allergic to tomatoes, cabbage, nuts, chocolate, and coconut. Defendant Jensen provided the plaintiff with a "Medical Duty Status" notification to provide to Food Service, alerting them about his food allergies. In addition, defendant Jensen noted that lab work needed to be completed "ASAP."

On April 10, 2009, the plaintiff was seen by defendant Jensen for his skin condition. He was prescribed an oral non-steroidal medication used to treat severe psoriasis.

On April 20, 2009, the plaintiff was given a consultation for an outside dermatologist regarding his chronic skin condition.

On April 23, 2009, the plaintiff was evaluated by defendant Holloway during the chronic care clinic. Dr. Holloway noted that the plaintiff refused to take the non-steroidal treatment and requested more of the steroidal ointment cream. Vitamin A & D ointment was ordered to assist the plaintiff with his chronic skin condition.

7

On May 1, 2009, defendant Holloway prescribed the steroidal ointment cream and Vitamin A & D ointment. At that time, the plaintiff denied any itching and indicated that he was feeling much better.

Later this same day, the plaintiff was evaluated for dizziness. Defendant Holloway provided the plaintiff with a "Medical Duty Status" notification for his food allergies to tomatoes, cabbage, chocolates, nuts, and coconuts.

On May 5, 2009, defendant Holloway gave the plaintiff a refill of the steroidal ointment cream.

On May 15, 2009, the plaintiff was given another refill of the steroidal ointment cream.

On May 16, 2009, the plaintiff was seen by an outside dermatologist for his chronic skin condition. He was prescribed injections used to treat severe skin diseases along with the original steroidal ointment cream and another steroidal cream used to treat skin diseases. Consideration was given to an immunosuppressant used to treat fungal infections.

On May 21, 2009, the plaintiff was seen by defendant Jensen for complaints of dizziness and ear and skin problems. During this visit, he was prescribed the steroidal ointment cream. Defendant Jensen also provided the plaintiff with a "Medical Duty Status" notification for his food allergies.

On June 2, 2009, the plaintiff was seen by defendant Jensen for bumps on his scalp which he reported having previously. The plaintiff reported that he stopped taking the antidepressant, also used to treat itching and reported that he was given another medication, an antibiotic used to treat infections, without any relief. The plaintiff was prescribed a different antibiotic for his skin condition.

On June 3, 2009, the plaintiff received a refill of the non-steroidal anti-inflammatory from defendant Horeis.

On June 5, 2009, the plaintiff received a refill of his steroidal ointment cream from defendant Horeis and it was noted that he was scheduled to see an outside dermatologist.

On June 11, 2009, the plaintiff was seen by defendant Jensen for his chronic skin condition, at which time it was noted that the plaintiff continued to allege that he was not being given proper treatment for his condition. The plaintiff was advised that the steroidal ointment cream was not proper treatment "due to the damage to the skin and HPA axis suppression.[3]"

---

[3]The defendants' materials provide that the Hypothalamic-pituitary-adrenal axis is the interaction between organs which is a major part of the neuroendocrine system that controls reactions to stress and regulates many body processes, including digestion, the immune system, mood and
(continued...)

Later that evening, the plaintiff was evaluated in his housing unit for dizziness, vomiting and nausea. No significant findings were made. The plaintiff was instructed to get rest and eat lightly.

On June 18, 2009, a refill was requested for the steroidal ointment cream and filled by defendant Horeis.

On June 25, 2009, the plaintiff was evaluated by defendant Holloway for complaints of dizziness, buzzing and drainage from his left ear, and intense itching from the skin disorder. He was prescribed an antibiotic. Defendant Holloway further provided the plaintiff with a "Medical Duty Status" notification for his food allergies.

On June 30, 2009, it was noted that the plaintiff refused oral medication which was prescribed by the dermatologist. The plaintiff was advised that, due to the severity of his skin condition, he would need oral medication. The risks and benefits were explained.

On July 8, 2009, the plaintiff advised defendant Holloway that he would take a course of oral steroids, which came in a carry pack and did not require him to have to report to the pill line, for his skin disorder which was previously

---

[3](...continued)
emotions, sexuality, and energy storage and expenditure.

recommended by the dermatologist.

On July 16, 2009, the plaintiff reported that he needed a refill of his topical creams. An antibiotic ointment and an oral antibiotic were ordered.

On July 17, 2009, a different non-steroidal cream was prescribed for the plaintiff's itching and was filled by defendant Horeis.

On July 29, 2009, the anti-depressant also used to treat itching, which was previously prescribed to the plaintiff, was renewed by defendant Horeis.

On August 5, 2009, it was indicated that the plaintiff would begin medication therapy for his severe eczema, which included Cyclosporin. The following day, all prior prescriptions for the plaintiff's skin condition were discontinued and he was prescribed and given Cyclosporin capsules, as well as the steroidal ointment cream in one-pound jars by defendant Horeis.

On September 2, 2009, the plaintiff reported to defendant Holloway that he was not taking the Cyclosporin as prescribed by the dermatologist, nor had he ever taken it.

On September 15, 2009, it was noted by defendant Horeis that the plaintiff had missed over fourteen scheduled appointments with institution medical staff for follow-up with his medication. As a result, the Cyclosporin was discontinued for non-compliance.

On September 24, 2009, defendant Jensen noted that the plaintiff had a history of using "high potency" steroids.

On October 6, 2009, the plaintiff was treated by defendant Paone for symptoms unrelated to his skin condition.

On October 20, 2009, defendant Jensen noted that the plaintiff was a chronic steroid user.

On October 21, 2009, defendant Holloway prepared a consultation request seeking an evaluation by an ENT due to the plaintiff's history of eczema and ringing/buzzing in his ears for several weeks.

On October 22, 2009, the plaintiff was evaluated by defendant Holloway during the chronic care clinic. The plaintiff told defendant Holloway that he was using the cream prescribed by the dermatologist but was not taking the prescribed medication for his ear infection. The plaintiff was informed of the long term effect of prolonged usage of topical steroids.

On November 2, 2009, the plaintiff had a follow-up visit with defendant Jensen at which time it was again noted that the plaintiff was a chronic steroid user.

On November 23, 2009, the plaintiff complained of "breaking out" at the base of his spine and requested topical antibiotic cream which was prescribed

for him.

On November 24, 2009, the plaintiff reported that the topical cream had not helped and requested oral antibiotics.

On December 8, 2009, the plaintiff completed a CT scan and MRI of his brain for complaints of dizziness, the results of which were unremarkable.

On January 7, 2010, the plaintiff was given a refill of his steroidal ointment cream.

On January 22, 2010, the plaintiff was evaluated by medical staff for complaints of itching. The previously prescribed anti-depressant also used for itching was again recommended.

On April 2, 2010, the plaintiff was prescribed a different cream, an analog of Prednisone, for his skin condition.

On April 7, 2010, the plaintiff was evaluated by defendant Holloway during the chronic care clinic. Defendant Holloway provided the plaintiff with a "Medical Duty Status" notification for his food allergies.

On April 9, 2010, the plaintiff requested and was prescribed a refill of the carry pack steroids.

On May 3, 2010, the plaintiff was transferred to USP-Coleman.

With respect to the individual defendants alleged to have denied the

13

plaintiff adequate medical care, the defendants' materials provide that defendant Horeis is the Chief Pharmacist at USP-Canaan and has been a Commissioned Officer for the Public Health Services since November 1993. As Chief Pharmacist, defendant Horeis dispenses prescribed medication to inmates at USP-Canaan.

Defendant Tutza is a Medication Technician and is directly supervised by defendant Horeis. Defendant Tutza does not have authority to dispense medications or render routine medical treatment to inmates. Defendant Tutza works directly under defendant Horeis and does not have the authority to distribute medications without his consent.

Defendant Sullivan is the Health Services Administrator at USP-Canaan. Defendant Sullivan had no personal involvement in the plaintiff's medical treatment and, at no time, did defendant Sullivan render the plaintiff medical treatment or prescribe him medications.

With respect to the plaintiff's arm injury, the defendants' materials provide that, on December 1, 2009, defendant Mrad was working as a lieutenant in the Special Housing Unit, ("SHU"). At approximately 1:30 p.m., the plaintiff held his arm out of the food slot on the door of his cell, number 112, located on the Lower A-Range of the SHU. The plaintiff reported that he

refused to remove his arms from the food slot because he was upset about his special diet. Defendant Mrad informed the plaintiff that he would be placing hand restraints on him in order to escort him to the SHU Lieutenant's Office, so that he could discuss his issues with Food Service.

Upon placing one of the plaintiff's arms in restraints, the plaintiff attempted to pull his arm and the restraints back through the food slot into his cell. The plaintiff's arm was secured and he was instructed to place his other arm out through the wicket, but the plaintiff resisted. Upon being instructed for a second time to place his other arm through the wicket, the plaintiff complied.

On the same day, an injury assessment was completed in the SHU for the plaintiff. Medical notes reflect that the plaintiff had his arms extended from the cell door wicket, and when staff attempted to hand cuff him, his arm scraped against the metal on the wicket opening. The plaintiff was treated with antibiotic ointment and band aids were applied.

With respect to defendant Stuffle, the defendants' materials indicate that he was working on the day of this incident in the SHU. Although defendant Stuffle is familiar with the plaintiff, he does not recall an specifics with regard to this incident.

Defendant Hicks was working as a Lieutenant on the date of the

incident, but was not specifically assigned to work in the SHU. Defendant Hicks recalls the plaintiff, but does not recall any specifics with respect to the above incident.

With respect to the plaintiff's food allergies, the defendants' materials provide that, during his intake assessment at USP-Canaan in March 2009, the plaintiff did not report any known allergies.

On April 3, 2009, the plaintiff reported to defendant Jensen that he was allergic to tomatoes, cabbage, nuts, chocolate, and coconut. Defendant Jensen provided the plaintiff with a "Medical Duty Status" notification to provide to Food Service, alerting them about his food allergies on this date, as well as on May 21, 2009.

On May 1, 2009, June 25, 2009, and April 10, 2010, defendant Holloway also provided the plaintiff with a "Medical Duty Status" notification for his food allergies.

In accordance with procedure, once an inmate receives a copy of the "Medical Duty Status" notification, he maintains a copy and is directed to provide a copy to Food Service. Once Food Service receives the form from the inmate, it is posted on the Cook Supervisor's bulletin board to notify Food Service staff that the particular inmate has food allergies and may need a

16

special tray.

There are several food lines in the dining room from which inmates may self-select. Inmates who self-select can choose from the main line, the Heart Healthy line, or the no-flesh line. If none of these lines can meet the inmate's dietary requirements due to medical needs, an alternative tray is offered.

If an inmate is placed in the SHU and the main menu consists of food which he is allergic to, Food Service staff is notified by the SHU officers and a special tray, which could consist of food from any of the three lines is prepared and offered. If none of the prepared foods meets the inmate's dietary requirements, then a special tray is prepared.

Correctional officers working in the SHU are responsible for passing out food trays during meals. It is not the officers' responsibility to inspect the food for ingredients. If it is documented by Health Services that an inmate has specific allergies, SHU staff post a note on the inmate's cell door to ensure that he receives an appropriate meal, which meets his dietary standards. If a meal is accidentally served with ingredients which an inmate is allergic to, the meal is sent back to Food Service and the inmate is provided with an alternative meal.

On April 6, 2010, the defendants' materials provide that the plaintiff

received an incident report for interfering with security devices/blocking any locking device, conduct disruptive to the security or orderly running of the institution, and refusing to obey an order. Senior Officer J. Pellicano[4], who was working as an officer in the SHU passing out food trays on April 6, 2010, submitted a memorandum to the Captain regarding the incident. Officer Pellicano's memorandum states that staff members were aware that the plaintiff was allergic to peanut butter because it was noted on his cell door. When Officer Pellicano gave the plaintiff his evening food tray, the plaintiff asked him if the beef stew contained any type of tomato because he was allergic to tomatoes. Officer Pellicano contacted Food Service and was told that there was tomato in the stew. Officer Pellicano asked the plaintiff if he would take a no meat tray which contained no tomatoes, but the plaintiff refused. Officer Pellicano was informed by Food Service that the plaintiff would be provided with a substitute meal.

At approximately 7:30 p.m., a bag meal consisting of hard boiled eggs, bread, peanut butter, and jelly was delivered and provided to the plaintiff. The plaintiff indicated that he was allergic to peanut butter. Although the plaintiff received peanut butter which he could not eat, he was also provided with two

---

[4]Officer Pellicano has not been named as a defendant in this action.

boiled eggs and bread. The plaintiff was given foods to meet his dietary requirements, which excluded the foods to which he was allergic. The plaintiff took the meal and began screaming and pounding on his cell door.

Later, while staff was passing out toilet paper, the plaintiff placed his hands through the wicket and refused to remove his arms so that the wicket could be secured. The plaintiff was given an incident report and sanctioned for violating security codes.

Apparently in an attempt to controvert the materials submitted by the defendants, the plaintiff has submitted a lengthy letter along with exhibits, which the court has construed as his brief in opposition to the defendants' motion. Upon review, the plaintiff's letter does nothing more than expand upon the allegations set forth in his complaint. Moreover, a good part of the plaintiff's exhibits relate to a time period not relevant to the instant action. Finally, of those materials which are dated for the relevant time period, most, if not all of these exhibits, have already been submitted by the defendants and shed no new light on the matter.

Considering then the substance of plaintiff's claims, in their pending motion the defendants argue, among other things, that they are entitled to summary judgment because the plaintiff's claims regarding his food allergies,

medical treatment, and excessive force fail to state a claim.

With respect to the plaintiff's claim that he was denied appropriate medical treatment for his skin condition, in the medical context, an Eighth Amendment violation occurs only when government officials are deliberately indifferent to an inmate's serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 105 (1976). Such deliberate indifference involves the "unnecessary and wanton infliction of pain." Id. at 104. To sustain an Eighth Amendment claims for deliberate indifference to a medical need, the plaintiff must establish that (1) the deprivation alleged must be, objectively, sufficiently serious, and (2) the prison official must have a sufficiently culpable state of mind, i.e. a state of mind that is deliberately indifferent to inmate health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994); see also Spruill v. Gillis, 372 F.3d 218, 237 (3d Cir. 2004). It is well settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see also Estelle, 429 U.S. at 106.

Courts are reluctant to second-guess the propriety or adequacy of a particular course of medical treatment. See James v. Dep't of Corr., 230 F. App'x 195 (3d Cir. 2007). Where there is a dispute or disagreement between

an inmate and doctors over alternative treatment plans, the inmate's complaint will fail under an Eighth Amendment Constitutional claim since "the exercise by a doctor of his professional judgment is never deliberate indifference." See Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990); see also Youngberg v. Romeo, 457 U.S. 307, 322 (1982); Gindraw v. Dendler, 967 F.Supp. 833 (E.D.Pa. 1997).

Here, it is clear from the facts of record that the defendants were not deliberately indifferent to the plaintiff's medical needs and, specifically, the skin condition of which he complains. In fact, the plaintiff received treatment on a continuous and consistent basis by both the medical staff at USP-Canaan and an outside dermatologist for his skin condition. Moreover, the record establishes that, although he was encouraged to use alternative treatment plans, the plaintiff was not denied prescriptions for topical ointments or creams for his skin condition. While the plaintiff may disagree with the treatment he received while at USP-Canaan, there is no indication on the record before the court that his treatment was in violation of the mandates of the Eighth Amendment. As such, the defendants should be granted summary judgment with respect to this claim.

With respect to the plaintiff's Eighth Amendment claim that he was

served foods that he could not eat because of allergies and that he was not provided substitute meals, the court initially notes that the plaintiff alleges no specific personal involvement by any of the defendants with respect to this claim. To state a claim under §1983, the plaintiff must show that the defendants, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States.  42 U.S.C. §1983; Morse v. Lower Merion School District, 132 F.3d 902 (3d Cir. 1997); Maine v. Thiboutot, 448 U.S. 1 (1980).  Moreover, liability under §1983 is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence.  Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)(citing Rhode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). Here, the plaintiff only generally alleges that "food service staff and numerous officer[s]" were involved in his food allergy claim, without identifying any specific individuals. Therefore, the plaintiff's claim can be dismissed on this basis.

In the alternative, even if the plaintiff had alleged sufficient personal involvement, in evaluating this claim, in the non-medical context, the Eighth Amendment imposes a duty upon prison officials to provide humane

conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526–527 (1984). To state an Eighth Amendment claim based on prison conditions, again, a plaintiff must meet two (2) requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the official "must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994). An objectively, sufficiently serious injury is one that denies the inmate "the minimal civilized measure of life's necessities," such as food, water, shelter. Rhodes v. Chapman, 452 U.S. 337, 347 (1981); see also Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 419 (3d Cir. 2000).

Pursuant to the Eighth Amendment, prisoners are entitled to a nutritionally adequate diet. Laufgas v. Speziale, 263 Fed. Appx. 192, 198 (3d Cir. 2008) (citing Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980)). The Eighth Amendment requires that prison officials serve "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Id.

Here, there is no indication from the record that the defendants were

deliberately indifferent to the plaintiff's food allergies or that the plaintiff was not provided with a nutritionally adequate diet. On numerous occasions, the plaintiff was provided with a "Medical Duty Status" notification, which informed food services about the plaintiff's allergies. On the only specific incident of record, when the plaintiff notified SHU staff that his food contained tomatoes to which he was allergic, staff confirmed the allergy with food services and offered the plaintiff an alternative no meat tray which the plaintiff refused. The plaintiff was then provided a bag lunch which, while it also contained an item to which the plaintiff was allergic, i.e., peanut butter, contained hard boiled eggs and bread to which the plaintiff was not allergic. On the record before the court, there is no indication that the defendants' actions violated the Eighth Amendment in this respect and, as a result, the defendants are also entitled to summary judgment with respect to the plaintiff's food allergy claim.

Finally, with respect to the plaintiff's excessive force claim, the use of excessive force against prisoners may constitute cruel and unusual punishment in violation of the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 5 (1992). The Eighth Amendment protects inmates from "unnecessary and wanton infliction of pain." Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986) (citations and

internal quotations omitted)). "[T]here is no constitutional violation for 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind .'" Brooks v. Kyler, 204 F.3d 102, 107 (3d Cir. 2000) (quoting Hudson, 503 U.S. at 9-10). However, the degree of injury, if any, is a relevant factor in the determination of the excessiveness of the force used. See id. at 106.

When an inmate raises an excessive use of force claim, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" See id. (quoting Hudson, 503 U.S. at 7.) The following factors guide this inquiry:

> (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them' and (5) 'any efforts made to temper the severity of a forceful response.'

Id. (quoting Whitley, 475 U.S. at 321).

In this case, despite the claim set forth in the plaintiff's complaint that defendants Mrad, Hicks and Stuffle attempted to "break" his arm on the day in question, he has failed to demonstrate any issues of fact that the defendants' actions involved the use of force of a sort repugnant to the conscience of mankind or that any actions taken by them were maliciously

25

and sadistically applied to cause harm. In fact, the record demonstrates that the plaintiff admittedly was holding the food slot open in protest of his diet and would not remove his arms from the wicket in order to allow officers to secure it. Defendant Mrad informed the plaintiff that he would be placed in restraints and brought to the SHU Lieutenant's office to address his concerns with food service staff. When one of the plaintiff's arms was placed in restraints, the plaintiff attempted to pull his arm and the restraints back through the food slot. At this time, the plaintiff suffered abrasions to his right arm for which he was later treated with an antibiotic ointment and band-aids. There is no indication from the record that the defendants attacked the plaintiff or in any way attempted to break his arm, but only that they were attempting to gain control of the plaintiff who was attempting to resist being placed in restraints. Accordingly, summary judgment is warranted on the plaintiff's excessive force claim.

On the basis of the foregoing[5], **IT IS RECOMMENDED THAT:**

_____

[5]The court notes that it has reviewed the alternative arguments offered by the defendants in support of their motion to dismiss or, in the alternative, (continued...)

the defendants' motion to dismiss the plaintiff's complaint or, in

the alternative, for summary judgment, **(Doc. No. 20)**, be

**GRANTED**.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

Dated: January 11, 2012
O:\shared\REPORTS\2010 Reports\10-2401-01.wpd

---

[5](...continued)
for summary judgment and has found them to be well-taken. However,
because the above analysis adequately disposes of the claims raised in the
plaintiff's complaint, no further arguments have been addressed herein.